## William H. Bartlett et al., Appellants, v. First National Bank of Chicago, Appellee.

## Gen. No. 14,854.

1. NEGOTIABLE INSTRUMENTS—*when payment of draft upon forged endorsement does not confer cause of action.* If notwithstanding the name of the nominal payee of a note, an existing person not intended to have any interest therein, is forged as endorsee, payment has in fact been made to the person entitled thereto, there can be no recovery back.

2. NEGOTIABLE INSTRUMENTS—*when payment of draft upon forged endorsement confers cause of action.* Payment made to one claiming through the forgery of the endorsement of the real owner of the paper may ordinarily be recovered back by the drawee who paid in ignorance of the forgery.

3. NEGOTIABLE INSTRUMENTS—*when bank not liable back as upon forged endorsement.* If bearer drafts or drafts intentionally made to a fictitious payee (which in law are bearer drafts) are drawn by an agent either expressly or by implication of law authorized so to do and such drafts are cashed in the belief that the endorsements are the genuine signatures of the payees named therein, a bank so cashing such drafts is not liable but the loss must be borne by the principal who has so expressly or by conduct permitted such agent to operate.

4. ELECTION OF REMEDIES—*when does not arise.* If two persons are independently liable, the act of suing one of them is not an election of remedies and does not preclude suit against the other.

5. ELECTION OF REMEDIES—*what does not constitute.* Mere suit against an undisclosed principal after the relation has been disclosed is no bar to suit against the agent.

6. AGENCY—*when doctrine of undisclosed principal does not apply.* The doctrine of undisclosed principal is not applicable to commercial paper.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. HARRY OLSON, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Affirmed. Opinion filed June 28, 1910.

GEORGE P. MERRICK, for appellants.

H. K. and H. H. WHEELER and CUSTER & CAMERON, for appellee.

MR. JUSTICE MACK delivered the opinion of the court.

Plaintiffs sued defendant to recover back moneys paid to it on drafts drawn and indorsed in July 1906 substantially as follows:

'1327      '      BARTLETT, FRAZIER      $24.64

                    and

              CARRINGTON.

                        Reddick, 7–6, 1906.

Pay to the order of Chas. Elliott Twenty-four and 64/100 Dollars for 52 bushels 20 lbs. E. C. 47c.

                  Bartlett, Frazier & Carrington,

                        By R. L. Walsh,

                              Agent.

To Bartlett, Frazier

   & Carrington,

      Chicago, Ill.

(stenciled stamp)   'First Nat'l Bank

(Across the face)     Note Teller.

              Paid July 9, 1906.

                Chicago, Ill.

(Endorsements on draft):

                'Chas. Elliott.'

      'Pay to the order First National Bank

                Chicago,

            Reddick State Bank,

             Reddick, Illinois,

          Huntington James, Cashier.' "

The payees named were farmers in and about Reddick, Illinois, from whom plaintiffs bought grain. The drafts, 135 in number, aggregated over $20,000, but plaintiffs' loss thereon was about $13,000. Walsh had forged the payees' names and had discounted the paper at the Reddick State Bank.

The following letters were introduced in evidence:

          "Bartlett, Frazier & Carrington,

            Western Union Building.

                  Chicago, Sept. 8th, 1905.

Mr. R. L. Walsh,

     Reddick, Ill.

Dear Sir:—

   Yours of the 7th inst. at hand. In reference to your en-

dorsing the farmer's name, we do not approve of this as we do not consider it business-like—unless you have direct, written authority from the farmer to do so.   When you want to draw money from the Bank yourself to pay currency to the farmer, make the check read 'Pay to the order of Currency account' (and then give the name of the farmer) and then when you draw the money at the Bank, endorse your name but not the farmer's name on the back.

This will make our records here show plainly to whom the money should be charged and under our surety bond we will be protected in case any of our Agents make a wrong use of the money.

Very truly yours,<br>
B. F. & C."

"Bartlett, Frazier & Carrington,<br>
Western Union Building.<br>
Chicago, May 29th, 1906.

Mr. R. L. Walsh,
     Reddick, Ill.
Dear Sir:—

Your favor of the 28th inst. at hand in reference to the manner in which you have conducted our business at Reddick.

As we have written you before, we think you have been rather careless in the manner in which you have written checks.   It is a very bad habit to write your currency checks or large checks to your own order.   To speak plainly, it puts it in a man's power to use them if he wishes to do so, and where there is an opportunity the temptation of course is much greater, you must remember.   We have had one or two other agents who have gone wrong in the last five or six years and generally in some such manner.   We felt that an investigation would be a good thing and you certainly must feel a good deal better that one has been made, and that everything, as far as the writer knows, has turned out to show that you have been perfectly honest in your management of the affairs.

We have a few other agents who sometimes advance money to farmers, but they always make the note to themselves and when the money is returned insist on the farmer giving him a check payable to his own order so as to keep their own per-

sonal affairs and funds entirely separate from the funds of the firm. You speak about the grain shortages, which certainly were entirely too large, but we trust you have taken such precaution now that no such large shortage will occur again. We trust you will continue to do the largest business at Reddick.

Very truly yours,<br>B. F. & C."

Plaintiffs discovered some irregularities in Walsh's transactions in the spring of 1906, but, on investigation made in May 1906, found that while he had not followed the instructions of September 8, 1905, but had made the drafts payable to the farmer and had indorsed the farmer's name thereon, nevertheless, in each instance he had actually received the grain and had paid the payees of the drafts, whose names he had indorsed, out of his own account.

At the same time that the letter of September 8, 1905, was sent to Walsh the following letter was sent by plaintiffs to the Reddick bank:

"Bartlett, Frazier and Carrington.
Chicago, September 8, 1905.

State Bank of Reddick,
    Reddick, Ill.
Dear Sir:—

In future, will you kindly cash drafts drawn on us which read—'Pay to the order of currency account of' (name of the farmer to be inserted) and then endorsed on the back by Mr. R. L. Walsh, our agent at Reddick and, of course, signed by him.

This will enable Mr. Walsh to draw all the currency necessary where the farmers wish payment in currency and at the same time it will keep our records straight.

Yours very truly,<br>B. F. & C."

After the investigation of May 1906 and the discovery that Walsh had not followed his instructions literally, but had continued his former practice of making the checks payable to the farmer and indorsing the farmer's name, plaintiffs

gave neither the Reddick bank nor the appellee any notice of the investigation or discoveries made by them, or any additional notice not to continue to discount such drafts. In November 1906, within a month after the discovery of Walsh's wrongdoing, plaintiff's sued the Reddick Bank, but dismissed the suit before commencing this action. About December 1906, or January 1907, plaintiffs verbally notified defendant of the forgeries, stating that they understood they could hold either defendant or the Reddick Bank, but hoped it would not become necessary to sue defendant. In December 1907, written notice was given to the same effect.

In the trial court, appellee succeeded on the authority of U. S. v. Nat. Exch. Bk., 141 Fed. R. 209. Since then this decision has been reversed by the Supreme Court of the United States, 214 U. S. 302. If, in this case, the appellee was the rightful owner of these instruments so that the payments made by appellants to it were made to the person entitled thereto, then there can be no recovery back. If, on the other hand, payments were made under a mutual mistake to one not the rightful holder, we should have to determine whether or not the recovery is barred by mere delay in giving notice.

The Supreme Court of the United States held that one paying a draft bearing a forged indorsement is not barred from recovering back merely by his failure to give reasonable notice of the discovery of the forgery but only on proof by defendant of loss actually suffered by the delay.

Whether this decision is in conflict with the rule enunciated in Continental Natl. Bk. v. Metropolitan Natl. Bk., 107 Ill. App. 455, or whether, in the absence of binding Illinois authority, we should follow the decision of the Supreme Court of the United States or that of other courts, as e. g., McNeely Co. v. Bk. of North Am., 221 Pa. St. 588, holding that recovery is barred irrespective of loss, need not, in view of the results reached by us on the principal question in this case, be here determined.

We cannot, however, agree with appellee that the bringing of the suit against the Reddick Bank, subsequently dismissed on motion of plaintiffs, was an election of remedies

and a waiver of any possible claim against appellee. The only basis for a claim of appellants against the Reddick Bank is either that by its indorsement the Reddick Bank warranted the genuineness of the payees' signatures, not only to subsequent purchasers but also to the drawee, or that the appellee was merely a collecting agent for the Reddick Bank, its undisclosed principal. Without expressing any opinion as to whether or not any indorser ever warrants the genuineness of the document to the drawee, it is clear that if both the Reddick Bank and appellee did so warrant, each would be liable independently of the other, on its warranty. No question of election of remedies could arise. As to the second possible basis, first, the doctrine of undisclosed principal is not applicable to commercial paper (Mechem, 23 Harvard Law Review, 519); second, even if it were, mere suit against the principal after the relation has been disclosed, is no bar to suit against the agent. Mechem Agency, sec. 699; Mussenden v. Raiffe, 131 Ill. App. 456.

It is therefore necessary to ascertain whether appellee was the rightful owner of the drafts, or whether it held under a forged endorsement.

The law is well settled that payment made to one claiming through the forgery of the endorsement of the real owner of the paper may ordinarily be recovered back by the drawee who paid in ignorance of the forgery. In this State it has been held that the same principle is applicable when A, forging the name of B as drawer, draws a bill on D, payable to C, and then forges C's name as endorser, even though in this case A, who is the real though not the nominal drawer, never intended C to have any interest in the paper and C in fact acquired no interest therein. First Natl. Bk. v. N. W. Bk., 152 Ill. 296. It is unnecessary for us to consider in how far the authority of this case, which is in conflict with cases in other jurisdictions, is shaken by the fact that the case of Vagliano v. Bank of England, 23 Q. B. Div. 243, upon which great reliance was placed by the court, had been reversed by the House of Lords (Bk. of Eng. v. Vagliano, (1891) A. C. 107) while the North Western Natl. Bank case was under ad-

visement. Moreover, inasmuch as the documents in question in the present case were all paid prior to July 1, 1907, it is unnecessary to consider the effect of the Negotiable Instrument Act of 1907, par. 9, subsec. 3.

While there is at common law a conflict as to whether D, the drawee of a bill drawn by A, in his own name as drawer, payable to B, whose signature is endorsed by A, is barred from recovering back money paid thereon to a holder in due course if A used B's name fictitiously but D did not know that it was so used, there is no question whatsoever that A would be liable as drawer on such an instrument. Anyone who makes an instrument payable to a real person, intending that the person named shall have no interest therein but using his name fictitiously, is liable to the bearer. Such an instrument, at least as to the drawer, is deemed payable to bearer.

In the present case, the drawers' name was not forged as in the Northwestern Natl. Bank case, *supra,* but on the other hand the drawers themselves did not sign it. The members of the firm of Bartlett, Frazier & Carrington in fact knew nothing of the drawing. Their agent drew in their names on themselves, not in their interest to pay their obligations, but in his own interest, to obtain money which he could embezzle. They were, however, the drawers of the instrument by him as their agent. If it can be said that they intended to make the instrument payable to a fictitious person, then they became obligated to the bearer thereof. Clearly Walsh did so intend; that is, the agent, purporting to act on behalf of his principals, intended, not that the parties named as payees but anyone to whom he, endorsing the payees' names, should deliver the documents, should be the owners thereof.

Does such an intention bind the principals? Is he, in other words, expressly or impliedly, either actually or apparently authorized to make bearer drafts in the name of and drawn upon his principals?

A bank cashier has implied authority to draw drafts on correspondent banks; of course, his actual authority is limited to transactions in the interest of the bank, but because of his apparent authority, he binds the bank, whether the bearer

draft is sold to a customer or utilized for his own purposes. And it is immaterial whether such a draft is made expressly payable to bearer or to a known individual, intended by the cashier not to have any interest therein and whose name is subsequently endorsed by the cashier for his own purposes. Money paid on such an instrument to an innocent purchaser under such an endorsement cannot be recovered back, because, while the endorsement is in a sense a forgery, nevertheless, the nominal payee is not the actual payee; the actual payee is bearer because the bank, through its cashier, intended to make the instrument payable not in name but in fact to bearer. The intention of the cashier is the intention of the drawer within the rule that an instrument intentionally made payable to a fictitious person is payable to bearer.

In Phillips v. Bank, 140 N. Y. 556, the drawee bank sought to hold the drawer bank for payments made on drafts drawn by its cashier in which the names of regular depositors were used by the cashier as payees and then endorsed by him for his own illegitimate purposes. The court said:

" * * * Whether indorsing the check in the name of the payee therein was a forgery in the legal sense, or not, is not the important question. In a general sense, of course, the cashier did forge the payee's name, but that fact did not affect the title or rights of the defendant. * * * * * *

"Though Bartlett selected, for the execution of his dishonest purposes, the names of persons who were dealers with his bank, it was, in legal effect, as though he had selected any names at random. The difference is that, by the methods resorted to, he averted suspicion on the part of the directors or other officers of his bank. The names he used were, for his purposes, fictitious, because he never intended that the paper should reach the persons whose names were upon them. The transaction was one solely for the fraudulent purpose of appropriating his bank's moneys, by a trick which his position enabled him to perform. * * * * * *

"It may be quite true that the cashier was not the agent of the bank to commit a forgery, or any other fraud of such a nature; but he was authorized to draw or check upon the bank's funds. If he abused his authority and robbed his

bank, it must suffer the loss. The distinction between such a case and the many other cases, which the plaintiff's counsel cites from, is in the fact that it was within the scope of the cashier's powers to bind the bank by his checks. In transmitting them, made out and indorsed as they were, the bank was so far concluded by his acts as to be estopped from now denying their validity."

While it is true that a corporation cannot act except through its representatives, whereas partners can act personally, nevertheless the relation of a cashier to his bank is merely that of an employe or agent. He does not represent the bank in any sense other than that in which any agent represents his principal. As the court intimated in the Phillips case, the directors of a bank are its representatives. We cannot agree with appellants' argument that, "the bank, in acting through its cashier in the matter of the issuance of commercial paper, the drawing and endorsing of checks, etc., in reality is acting *in person* and not through an agent."

Moreover in Snyder v. Bank, 221 Pa. St. 599, the checks were drawn not by a cashier of a bank but by an agent of an individual. He was authorized to draw checks. He drew them payable to an existing person whose name he endorsed for his own purposes. The court said:

"  *  *  *  *  Greenfield had admittedly been authorized to draw checks payable to bearer. A check so drawn and delivered by him to anyone could have been indorsed by the holder to another, and the payment of it by the bank to the indorsee could not have been questioned by the appellant. If, instead of drawing the four checks to the order of Niemann he had made them payable to bearer and gone to the bank and drawn the money himself, the appellant could not have repudiated the bank's payment to him.  *  *  *  *

"The intent of the drawer of the check, in inserting the name of a payee, is the sole test of whether the payee is a fictitious person, and the intent of the drawer of these checks as attorney for the appellant must, as just stated, be regarded as against the bank upon which they were drawn as the intent of the appellant himself."

The agency to draw bearer checks in both of these cases

authorized the agent to draw them payable either directly to bearer or to a person intended to have no interest therein.

In this case, Walsh, too, was empowered to draw bearer checks. He was appellants' agent clothed with authority to make negotiable paper. The present case could not be distinguished from the New York and Pennsylvania cases if this authority had been, as in those cases, to draw any kind of bearer checks. The letter of September 8, 1905, however, imposed a restriction as to the form of such paper, a restriction of which notice was given to the Reddick Bank.

Whether Walsh's agency was so general in its nature that such a restriction upon the form of the drafts might be deemed a non-essential even as against the Reddick Bank or as a secret limitation, not binding on appellee, a purchaser without notice thereof, need not be here determined, for in any event, limitations upon the authority granted an agent may be removed and his power to bind the principal extended, by subsequent grant, either express or implied, from the course of dealings and conduct of the parties. In the present case, appellants knew in May, 1906, that their specific instructions had been violated, that drafts had been drawn nominally payable to customers but endorsed in their names by Walsh, that the Reddick Bank and appellee had discounted such drafts and that they themselves had paid them. Nevertheless they neither repudiated the transactions nor instructed him to discontinue this originally forbidden practice.

It is true that there is no proof that appellee knew that the instructions had been departed from and Walsh's conduct condoned. It was not misled into further discounts by appellants' failure to stop these practices. It discounted in the belief that the endorsements were genuine. The question, however, is not, whether appellee can claim by estoppel against appellants, an estoppel to deny Walsh's authority to make bearer checks as against one purchasing them in the belief that they are bearer checks and in reliance upon that authority, but whether appellants by their letter of May 29, 1906, authorized Walsh to draw his checks in this way thereafter.

If that be the fair interpretation thereof, if after having originally authorized him to use only one form of bearer check, they had, not by express words, but by the fair construction of their letter and by their failure to disaffirm his prior acts, authorized him to use other forms after having found that his use of the other forms had not resulted, as they had feared it might, in loss and fraud, then appellee would be entitled to protection, not by way of estoppel but because it had dealt with an agent acting within the scope of his authority. The letter of May 29, 1906, especially in connection with the failure of appellants to take any steps reimposing the original restrictions, after discovery of their violation, amounts, in our judgment, to a waiver of the restrictions as to the form of bearer drafts theretofore imposed on Walsh and justified his continued use of the former method, not of course for fraudulent but for legitimate purposes.

As Walsh was thus authorized to make the drafts payable to the farmer, and to endorse his name and to discount them, for the purpose of raising money to pay the farmer, in other words, as he was authorized to issue any form of bearer draft, the Reddick and the defendant banks became the rightful owners of these drafts. Plaintiffs' loss is due, therefore, not to payments made by them as drawees to wrongful holders or to those claiming under forged endorsements, but as in the New York and Pennsylvania cases, because their agent, acting within the scope of his authority to discount bearer checks, discounted them, not in the interest of his principals, but for his own fraudulent purposes. A third party, dealing with an agent, acting within the scope of his authority, is, however, not responsible for an abuse of his powers if he has no knowledge of such abuse. The loss is due to the agent's embezzlement. For this appellee is not answerable, and the judgment therefore must be affirmed.

*Affirmed.*